Please all rise. Dear ye, dear ye, dear ye, This Honorable President of the Court of the Second Judicial District is now open for pursuance of adjournment. The Honorable Susan F. Hutchinson, presiding. Please be seated. Your Honor, this case on file, Plaintiff, 14-F, short, 22 years, people in the state of Illinois, plaintiff's attorney, the R. E. L. M. Montano, defendant's counsel, R. E. L. Montano, defendant's counsel, Mr. Christopher White, R. E. L. Montano, plaintiff's attorney, Mr. Barry W. Jacobs. All right. Mr. White. Good morning, I'm Chris White from the Office of the State of Health Defender on behalf of the defendant, R. E. L. Montano. The issue presented here is whether testimony regarding a cadaver dog alert that does not lead to scientific confirmation of the presence of biological evidence must be excluded. The defendant here contends that such testimony should be excluded for two reasons. The first of which is because it fails to qualify as admissible expert testimony and also because any probative value of such testimony is outweighed by the danger of unfair prejudice. I know that that is your, those are your two primary issues, but don't we have a overwhelming other evidence otherwise in this case so that we really don't even have to consider that? Well, the State didn't argue a harmless error here, which sounds like the point you're making, and I would have argued that had they argued it, but I would contend that the argument is weighed, but even if not, I think the other evidence here, since it amounts to primarily witness testimony from various witnesses of events that occurred several years prior, in some ways I think makes the canine evidence even worse. If the evidence is so overwhelming, the testimony evidence I should say, is so overwhelming, then we would submit that the trial should have been based solely on that testimony. But because this is added, this canine evidence is added, it gives it sort of a quasi-scientific look. We believe that it unduly enhances, or is overly prejudicial, because some of that witness testimony is inherently inconsistent, consistent with each other, as I mentioned was very old. We don't know motivations of witnesses, that type of thing that you'd always have. And then to add on to that canine evidence and present it as scientific, I think is a dangerous situation. And it's one I think that was addressed in not only Cruz, but in the cases prior to Cruz, when Cruz sort of reiterated some of the concerns that came from Fanchment and some of the other cases. Fanchment is an old case, and the Supreme Court went back and looked at Fanchment. But recently the Supreme Court has said that courts can look back and science that at one point in time was new or novel or uncertain can now be settled and widely accepted as, if you look around the world, dogs are used everywhere to track humans, to locate narcotics, to detect bombs. And what the Supreme Court said in People v. Lerma recently on the testimony of unreliability of eyewitness identification testimony said what was novel and uncertain has turned into something that's settled and widely accepted. Why can't we say that we're reviewing court and look at the Fry hearing here? Or are we bound by the Supreme Court's decision in Cruz? Well, I think if there had been something substantial that showed an advance in the science as such, there might be some credence to that. But the problem they had way back in Fanchment and what they reiterated in Cruz was that testimony to the trailing shouldn't be allowed in, and the concerns were about the reliability of the tracking dog evidence. And I don't think that those concerns have fully been alleviated. A lot of the factors that were valid 90, 100 years ago are still valid now. Would you agree that the majority of jurisdictions in the United States allow this type of evidence? Yes. Subject to a proper foundation? And they always have, yes. So Cruz is an outlier, really, in terms of national acceptance of this type of testimony, correct? Cruz is an outlier. Wolf was an outlier. All of the Supreme Court history was an outlier because it's been accepted in some states for quite a few years prior to even Cruz. But it still doesn't eliminate the problem we have here, which is the exercise of, in the words of, I believe it was Fanchment, the mysterious power not possessed by human beings, a superstitious awe of the very name by which the dog is called, either a cadaver dog, a bloodhound, a search dog. It makes it more extreme or more dangerous, and as it says, dangerous in the extreme here to permit the introduction of such a testimony in a criminal case. And particularly true here where there is no scientific evidence. And the scientific evidence or other scientific evidence, I should say, which is the problem with the dog evidence, a scientific confirmation because the state would have us believe from the introduction of the evidence that the dog was able to alert on this piece of carpet or in the area, but that area that the dog alerted on was free from any type of scientific evidence, which makes it more incredulous because you've got the era of touch DNA and fiber analysis and hairs and all these other things. And for them to come up with the dog detected at 17 years prior, a dead body was here. And as the state knows, they're not even arguing that that body was the victim here, the alleged victim here. It's just a dead body, I think, is another situation that shows that the science hasn't gone that far, that they still are unable to determine the particular body to which that scent is tied. And, in fact, I think they made that point in one of those earlier cases was that every individual or animal has an odor peculiar to himself or itself, which will be especially noticeable on the spot where the animal or man has touched the ground and walking. Particles of waste matter given off by a particular individual or animal from sweat glands or other ducts remain on the ground. And while undergoing some chemical change, if they come in contact with the olfactory nerves of a hound, create an impression which he is able to recognize and distinguish from all other impressions. Yet what we have here is the state saying that he didn't alert to a specific scent of Mrs. Montano. And, in fact, the dog may not even be capable of alerting to the specific scent of Mrs. Montano, but simply to a deceased probably or possibly human body at some point. It was over three dogs, right? Yes. All three dogs. The three were consistent, trained by the same person and there were three dogs. And there was, I know you mentioned the lack of any other evidence on the carpet, but there was an eyewitness who testified she saw the victim wrapped up in the carpet, correct? There was. So there was some corroboration that the deceased victim had been concealed in that carpet. Well, and again, with the sort of changes within some of that witness testimony, we don't know whether the dog alert corroborated the witness statement or whether the witness statement corroborated the dog alert. You've got situations like this court had and more where it's allowed in in certain cases, but in those cases, in the case of a drug case in that case, drugs are ultimately recovered and the person's conviction is based on a concession of drugs. The dog evidence was used for some sort of additional corroboration, although there seems to be maybe a problem with the word corroboration because there are ways you can sort of allay versus meaning of corroborating that it's similar or supports, as opposed to the legal definition where it's permissible corroboration, it's evidence that's allowed to be considered. And in Moore, I think it's different than in Cruz because ultimately those drugs were recovered and the defendant was charged with possession of a certain amount of drugs, even though the drugs weren't recovered from the place where the dog had initially discovered those drugs or alerted to those drugs. It did show perhaps how the drugs got to a certain spot, but it ultimately did not prove the existence of those drugs and the defendant in that case would not have been able to have been convicted simply on the dog alert, is what you had here. Even if you had testimony regarding possession that the person at one time possessed drugs or, you know, various information like we have in this case, in Moore, you couldn't have charged him with X amount of narcotics to Y amount of narcotics, you know, possession, because we don't know what actually happened there or what he's in possession of, what contraband. Just as in this case, we don't know what it is about him because not only is it the problems that I mentioned before, but also subject to the 17 years, which everyone from Faschner, even to the expert witnesses here acknowledge, is going to deteriorate that evidence, cause the evidence more into question. So to have that basis, that information be serving as a basis to sort of legitimize the otherwise questionable testimony, we think is particularly prejudicial. Your argument is that even if this testimony were with the advances in, you know, the study of canines, that even with that, if we were to say Cruz is no longer, should no longer be the law, they haven't established a foundation to allow this testimony in because of the 17 years. Is that your argument? It could well be. I don't think this is really the ideal test case for whether or not advancements have occurred because I don't think anyone was particularly, even the state's witness, I don't remember specifically what she said, but she certainly acknowledged that it would not be as strong an evidence 17 years after it occurred than it had been a week later or two weeks later. So I think there is foundation problems as well, so making this not the ideal case to reexamine Cruz. But even if it were better, I think there's still problems with the evidence. And, in fact, I think part of the problem too is you've got, when this evidence is allowed in, you allow the jury to have sort of a CSI ruling. You give them a touchstone by which they're invited to bolster with this mysterious power of that which has been blessed by science, where it might otherwise have considered to have been unworthy or untrustworthy evidence. It's particularly true where there's an absence of biological evidence validating that power and where the dog was alleged to have alerted a house that was decades old. Before the dog alerted, before the dog was used, the police were in possession of most of, if not all, of the statement evidence, correct? They were, yes. So it's not as if the police presented to these witnesses, we know she was murdered because the dogs hit on the carpet. They had those statements before the expert came out and used the dogs, correct? I'm not sure the rug identification was prior to that because they recovered the rug and the rug didn't have any significance until the dog alerted on it. And then the girl, the complainant, made the identification that that was a rug she remembered having in the home as a child. I don't think, I don't believe they were in possession of that prior to the dog alert. But the other statements they were, the statements that the woman was missing and they had seen her in the home with the defendant, those types of statements were there. Some of them changed over time, but they were in possession of those statements prior to obtaining the dog evidence. In one we had witnesses that testified that there were drugs transported in the car, correct? Yes. And then after that we had the scientific evidence from the drugs located in the apartment. Yes. I mean, is that the type of individualized suspicion that Cruz spoke of? Well, Cruz, definitely the situation in Cruz was such that they were searching for, I guess, I guess an unknown because they were tracking someone at that point or several people at that point. Here you do have a particularized suspicion, but there again I think makes it even more problematic because you sort of know how the puzzle ends here. You can use the dog evidence in order to support the idea or the testimony of other witnesses who may not, without that dog evidence, be terribly credible. Because, again, you have the DNA evidence. There's no scientific evidence that shows that there actually was a body present at that time. You've only got the signal by the dogs, and it is several dogs, but who have been trained by the same person to testify that, yes, that alert means the presence of a deceased human body, not just a deceased animal or a live body or a deceased body, but without any type of trace DNA or any type of trace evidence being able to establish or to sort of establish that evidence. Wasn't it more specific even than that that the alert was not to a deceased body but to fluids and environmental breakdown of fluids of a deceased body? That's true. That's what the expert testimony was, and that is how the dog is able to, according to the expert, locate this is through the fluids and the other type of biological evidence. And the training that, I'll say Dr. Susan because I can't say her last name, the training that Dr. Susan talked about with these dogs is very different than what happened in, and I can't say Fence, Fence, whatever, Fence, Schmitt. It's very, very different than occurred there, correct? Correct. But you still have, even with, you know, if the testimony is that the dog alerts because there are biological fluids or decay or tissue or whatever, then the question would become then where is that tissue or decay or biological evidence? Because if there's enough in order to alert a dog, then one would presume there's enough that something could be recovered, particularly where we have things such as touch DNA. Would this evidence be admissible if there was some scientific evidence recovered showing a dead body in that location? It would certainly be a closer case. It may be worth reevaluating clues at that point, but I don't think it would be admissible even in this case because they still did not establish that that dead body was that of the victim. You've essentially got a murder conviction based on the lack of a body, which, of course, you can have if there are other pieces of evidence, but it seems those other pieces of evidence should be pretty strong and more than just a dog alerting that at some point this person may have been there or someone may have been there who is deceased. Was the expert aware of the fact that the body had allegedly been wrapped in the carpet before the canines were used? Before they were used, I believe so. There's always a possibility of confirmation bias. I'm not sure I understand your question. Like a lineup, and the officer who's conducting the lineup knows which one of the people in the lineup is the suspect. Right. That's why we videotape, or theoretically videotaping is done to ensure that there is no prompting. Right. Well, exactly. My question is did she know that the victim had allegedly been wrapped in this carpet before the dogs hit on it? You know, I really don't recall specifically because I know they took the dogs out a couple times and then it alerted not only on the carpet but on the ground sort of around the carpet. So I don't recall whether she knew that or not at that particular time. I don't think she did because I think the police just said, you know, go out and find, turn the dogs loose essentially and see what they discover. You'll have an opportunity for a reply. Okay. Thank you. Thank you. Mr. Jacobs. Good morning. I'm Harry Jacobs. I'm behalf of the Plinkett family in this case. May it please the court and counsel. Mr. Jacobs, there have been times when I have reviewed briefs from not just you but from your office where plain error or harmless error is contemplated and argued and we wonder why. In this particular set of briefs, I wonder why not. In this case, I didn't argue specifically that it was harmless error, although I do believe it was. I did argue that the evidence was not unduly prejudicial because of the overwhelming testimonial evidence from the defendant's family, his daughter Mirabel, his sister Narcissa, about the crime itself where Narcissa testified that he actually told her that I killed Guadalupe and then she later testified that she saw Guadalupe wrapped in a carpet. Conflicting testimony based on her grand jury testimony, this case spanned from 1994 to 2008 when the defendant, I believe, was arrested, but initially she indicated she had not seen Guadalupe's face but then later did indicate she'd seen it, she was afraid of the defendant, and had not been forthright. So although I did not argue it, the court certainly has the authority to find that the error was harmless in this case if, in fact, there was error. The State's position there certainly was not error. This is not even necessary to overrule Cruz. This is simply distinguishable from Cruz. Well, why would the State even attempt to introduce this evidence with Cruz out there? The language in Cruz seems to be pretty clear that this type of evidence is not admissible for any proposition in a criminal case. I think it's different. The Cruz language, and this court has found it in Moore, the Cruz language is pretty specific about the use of bloodhound evidence, which comes from the Van Schmidt case. Bloodhound evidence, so scent-tracking evidence, is not admissible to prove a proposition in a criminal case. It's the same science. It's the same biological tool that's used by the dogs. Not exactly the same science. In fact, Dr. Stayscall testified that dogs are learning on the byproducts of human decomposition. My point is it's the same sense of the dogs. It's their sense of smell. It's the same process. The dogs can be trained to detect drugs, narcotics, human scent, decomposition, a variety of, but it's all the same science. It's the ability of dogs to detect a particular scent that they are trained to detect, and then they're used by humans to find or to locate those items that the dogs hit on. Yes. However, it's a different proposition for a dog to sniff a scarf and identify an unknown perfume or sweat or smell than it is for a dog to alert on the byproducts of decomposition, human decomposition. And that's what these dogs are specifically trained to alert on. So it is distinguishable from CRUISE and not distinguishable from the drug cases because drugs are a distinct substance that the dogs are trained to alert on. Similarly, in this case, the dogs are trained to alert on those specific products, the amines from ammonia, the gray wax that Dr. Stayscall testified, could persist for a long time and be available. In other than Moore, are there any other cases? You're saying this is the same as drugs. Are there any other cases out there that talk about drugs being admitted for this purpose, basically to establish the purpose of the lifetime, to establish a fact and issue of the trial, not in the motion expressed, not, you know, anything having to do with the Fourth Amendment, talking about the fact and issue of trial. Are there any cases other than Moore? In Moore, the- Other than Moore. Are there any cases other than Moore? There's a United States v. Hubbard, which was cited previously. That's a Seventh Circuit case. In Moore. Are there any cases in Illinois other than Moore that talk about CRUISE and say, this is okay even though we have CRUISE out there? Not that I'm aware of, no. Now, in Moore, there were drugs recovered from the apartment. Correct. Correct. Now, let's assume for a second in Moore that those drugs were not recovered. Is Moore still good law under CRUISE? The dog alert would still be probative of drugs under CRUISE and Moore, yes. It would still be good law. What we're talking about is the reliability of the alert, not whether or not it was ultimately corroborated. We're talking about the reliability and whether or not that- In Moore, the dog alert corroborated the other testimony, the other observation of the officers who had seen this defendant running this drug house. In Moore, the dog alert was corroborated by scientific evidence later. The alert itself was not corroborated because the alert was on the car. Well, I mean, you could argue that that- I mean, if I'm arguing this to a jury, I'm arguing that that alert was corroborated by the finding of drugs in the apartment. Well, certainly, it was provative and circumstantial evidence of all the other testimony that was presented that these officers had observed this defendant running the drug house and had seen him driving away with a brown bag in the car, and so that all supports. It does not prove it. And I guess the defendant's view of this is that there has to be corroborated evidence of the alert. I don't believe Moore stands for that proposition. The evidence in Moore, the alert on the door of the car, corroborated all the other observations and ultimately the drugs that were found. Well, now, Moore, I mean, the entire analysis of Moore, about Cruz and distinguishing the facts of Moore from Cruz, is contained in one paragraph. And it cites a quotation from people such as Campbell, in one of the extreme quotations, about the use of trained dogs as follow-up investigative technique. Yes. So it relies on Campbell, correct? Yes. Now, Campbell was a Fourth Amendment case. It was a motion to suppress, and the issue was whether or not- There's an appeal from the granting of a motion to suppress, a state appeal from the granting of a motion to suppress. You agree that's much different. I mean, if we're talking about whether something satisfies the Fourth Amendment or something's admissible for probable cause and a motion to suppress, it's much different than what was talked about in Cruz, and that is to prove an issue at trial, correct? It's probably an issue at trial, yes. I mean, just explain to me how you read Moore, relying on Campbell, jumping from Campbell, which is a motion to suppress, to now, okay, this is okay at trial, to prove that there were drugs in the car. I believe in Moore. My reading of Moore is that the Moore court was looking for dog evidence cases, and it cited Campbell as one of them. It also cited Hubbard previously, saying that the dog's alert, although subject to different interpretations, was sufficiently probative. The court cited Hubbard on the issue of hearsay. That was the next paragraph. The only paragraph that distinguishes Cruz, and we're not talking about hearsay, we're talking about admissibility under Cruz, was that one paragraph, and they cite the language, and the court cited the language in Campbell. Saying it was an appropriate technique. Correct, which is true. I mean, I don't know that this court would ever disagree with that. Certainly, if you get an informant saying they're dealing drugs out of that car, and they walk the dog around the car, out in public, wherever it can be, and the dog hits on the car, and then you go get a search warrant based upon that, that's probable cause. It doesn't violate the Fourth Amendment. You can use it for probable cause. It's a great investigative technique. I don't think anybody would disagree with that. The issue now, though, shifts in light of Cruz, and we're a Cruz state, you know, we have to follow the Supreme Court. In light of Cruz, is it admissible to prove that fact at trial? And here, we're proving the corpus delicti. There was a body in that law. We are offering evidence that there had been a body present, yes. However, you know, it's still the state's position that more was decided upon the reliability of the evidence. There's actually no discussion of real reliability, but on the potentness of the alert. In your brief, you object to and ask us not to consider the defendant's citation to new literature that hadn't been offered in the trial court, but aren't we free to consider such literature in deciding whether or not a scientific method is new or novel or whether it's gained general acceptance? Yes. So are we supposed to just do it all on our own, or can the parties direct our attention to scientific literature that we might review? Certainly, the court can consider on the question of whether or not this principle and use of the cadaver-scented detection was generally accepted in the scientific community. My challenge is that the defendant cites this treatise, I believe it's the Human Cadaver Dog Handbook, to attack the underlying science, the reliability of it. That author obviously didn't appear at the Frey hearing. That evidence wasn't presented at the Frey hearing. So it should not be considered by this court because it is basically hearsay, but not something that's cross-examination that the judge decided to not hear. The Supreme Court said in McGowan and other cases that we are free to look at scientific literature, peer-reviewed literature, scientific journals, law review articles to decide. That's correct. I'm just saying that this defendant cited particular passages out of the Human Cadaver Handbook. We don't have the full handbook. The court can certainly consider the handbook, but these passages where he attacks the reliability of the human cadaver alerts doesn't go to whether or not those alerts are generally accepted in the science community and therefore alone should not be considered, no. I think, at least for me, the point of Justice Burke's question is, is there a difference between using something for probable cause and using something for beyond a reasonable doubt? We're confining it only to the reliability state's position that there should not be a difference. We're talking about the reliability of the dog alert. The science is the same, however it's used, whether it's used for probable cause or beyond a reasonable doubt or if you're looking for a dead body in the World Trade Center. The science is still the same. The reliability question remains the same. Fanschmid in 1914 said, information about how dogs alerts, and they say forensic, scientific, legal, or otherwise, is basically a mystery of character not to be admitted. But that was 1914. Dr. Stasekall testified in detail about the knowledge in the science community that there's actually an FBI group, the SDV dog group, a group of different professionals, including the FBI scientists, people who study the movement of fluids through soil. All these people agree that this is a scientific principle and it's generally accepted. And she cited that group as evidence of general acceptance. Now, I notice in both of the briefs there's no discussion. The use of evidence 702, the admissibility of expert testimony, is that this doesn't really present any change in the law, but it does direct trial courts on how to conduct a trial hearing, correct? I believe so, yes. And the trial court here clearly followed the LMA rule of evidence 702. There was a fried hearing, and the court found general acceptance, correct? Yes, apparently. Prior to the fried hearing, the motion to eliminate, the state sought to not conduct a fried hearing, stating that this was a matter of dog training and handling and not a matter of science. Judge Shelton disagreed and did conduct the fried hearing, but found that the evidence, although not novel, was generally accepted in the science community based upon Dr. Teskel's testimony. There's been no challenge to the handling of these dogs or how Ellen Pono, I believe was her name, she was the handler of the dog, about how she conducted this. She did testify, to my recollection, that all three dogs separately learned it on both the rug and the hole in the ground at the Hobson Farm. Was there a fried hearing in Cruz? I don't recall. I don't believe so, but that could be incorrect. Would that affect the application of Cruz to this case where there was not a fried hearing and here there was? The state maintains that, yes, it should. The testimony in Cruz was, I believe, a deputy testifying about the way a dog moved from the porch to the car and back, testifying that that, and the state later argued, that that evidence showed that there was more than one assailant and that the victim in that case had been perhaps transported in a different route. We know that history proves that the dog handler, or at least the conclusions he drew, were wrong. Yes. So I presume there was no fried hearing in that case. I will get back to the point, though, that Dr. Stasekal, who was qualified as an expert in a number of fields, the dog training and handling, in forensic taphonomy, which is apparently the study of body decomposition in soil, and she testified that, as I think I have already said, that the use of cadaver scent dogs is basically universal at this point. She also testified, and I probably said this as well, about the specific components that could be available to a dog after 17 years, or she said after a long time. She didn't say 17 years. Is the science not novel because we all know that dogs can smell better than humans, or it's just not novel anymore like it would have been in 1914? What's the difference? I can't speak for Judge Sheldon, but, yes, the science is no longer novel. As I said, infatuation in 1914, the court said the information they had, scientific, legal, or otherwise, was not of a character to be admitted. That was 1914. They characterized it as an unknown, a mystery of how a dog scented. At this point, there's significant research into the field ongoing, so the fact that Dr. Stasekal testified about a rudimentary study looking into profiles of dogs at the University of Tennessee doesn't mean that her research is invalid, that there's other contrary research. Her testimony was very consistent with all the studies she cited and that the defendant picks up on in his brief. Did the defense retain an expert to respond to that testimony? I don't believe so. I don't recall that, no. But looking at the reliability of this evidence, it's the state's position and the state urges the court to conclude that the court didn't use its discretion in finding that this science was generally accepted in the science community and, therefore, sufficient under Frye. Thank you. Thank you. And Mr. White. Thank you. There has been a lot of discussion about the widespread use of dogs over time for search and rescue, for drug interdiction, things like that, but there are a lot of things that we've used in the past and even presently in order to, particularly in life-saving situations, that don't meet the level of scientific confirmation, certainly to the point where it can be introduced into court as evidence of corpus delecti, as Justice Brewer pointed out, or to establish the ultimate fact of the case as Cruz prohibits. But don't we still consider all of that science or all of those circumstances when we decide whether something is reliable? We do. But I think it also has to be more than in a dog order situation, why a dog order, perhaps while it may sometimes be reliable in certain circumstances, it is not science in the sense that it is not subjected to the same level of sort of testing by other sources, that type of thing. I mean, we've had a lot of situations like psychics and hypnotism, phrenology, seances, even hunches, if we're looking for a dead body or we're looking for a live body, for that matter, for rescue situations. 9-11 was one, I think, that the state pointed out where dogs were readily used. But it's not used. The recovery is great if we're able to use that successfully to recover someone, but it doesn't bear the same level of scientific weight that should establish a conviction for murder in the absence of a body. Would you agree with the state that there was no fry hearing in Cruz? I believe that's true. So doesn't that change our analysis? If you add a phrase to Cruz where there's been no fry hearing, I mean, in Cruz the court said dogs sent tracking evidence is, quote, inadmissible per se to establish, quote, any factual proposition in a criminal proceeding in Illinois. But in Cruz there was no fry hearing. Right, but it's still up to the... And since Cruz, the Illinois Supreme Court has adopted the Illinois Rules of Evidence that require a fry hearing when there's a challenge to new or novel science that has not yet been subjected to a fry hearing in Illinois. Right, and there was a fry hearing here, but we're suggesting that the fry hearing, that the concerns... What was wrong with the fry hearing? Well, there's nothing wrong with the fry hearing, but I don't think that the evidence that came out of the fry hearing served to alleviate any of the concerns that they had back in Fash Smith, back in Wolfe, back in Cruz, back at any of the times that dog evidence per se was held to be inadmissible, particularly to establish the ultimate fact of the case. Well, we can look at, the Supreme Court said in McGowan and other cases, we can look at outside jurisdictions, rulings by other courts, foreign states, to determine general acceptance, and clearly you're not even contesting general acceptance, correct? No, it's been generally accepted, I think, in many other states other than this one, or at least in several other states. But this state, the Supreme Court has held that it is per se not admissible, and the trial court here erred when it allowed it in despite testimony at a fry hearing, which didn't really serve to alleviate any of the concerns that have been expressed for decades regarding a lot of this material. And Cruz did acknowledge this. The Supreme Court acknowledged in Cruz, they were well aware of the fact that this type of testimony is admissible in other states, so it's not as if they were blind to that issue, correct? True. Yes, they're well aware of that. They even mentioned the point that the state is a minority in not considering this evidence, but did reaffirm the fact that it doesn't consider this evidence. But in noting that, they said that even in those other cases, they still needed that individualized suspicion, correct? Yes. So, I mean, even if it's just not a blanket admissibility of dog-tracking evidence, you know, you say you have a good fry hearing, according to Cruz, you would still, you know, if you're going to follow the other jurisdictions, you're still going to need some individualized suspicion. True, yes. Is there enough here under Moore? I mean, let's say Moore was one of those cases where it was an individualized suspicion case where we had, again, some corroboration before, the dog sniffed, and then corroboration after. Do we have that here? I think it's not here in large part because there's just not a body. I think that really calls into question the scientific nature of the dog's alert because other than the expert testifying, the dog handler, that they had, that this dog did alert, sort of its secret code of what a dog does when it discovers a dead body, we don't have anything else. And if there truly were some sort of, I mean, the dog had to have smelled something, and as Justice Hutchins pointed out, it was either bodily fluids or decomposed flesh or something like that, which otherwise was not discovered by any type of scientific analysis of the area. So I think it still calls into question, even with a prior hearing, particularly your particularized suspicion, because even though you have witness testimony, you still don't have any testimony that, despite the concerns that were raised 100 years ago, that it is this particular victim that was located here. It didn't, sort of the old movies where they track the, you know, they smell the scarf and then go after the victim. It just said, there's decomposed human flesh here at some point, is essentially what the dog alert said. So I don't think that's enough, even on an individualized basis, to support a conviction. Wasn't the real problem in Cruz, though, not so much what the dog did, but how those actions were interpreted by the human, because the human decided that there were two different routes and that might indicate more than one perpetrator. And maybe that really wasn't the dog's fault. That was the interpretation by the handler, which is not covered in these questions of science, is it? No, and that's, I think, another reason why it can't really be considered science's stuff. As I said before, you know, science is supposed to be an objective conclusion, which can be checked by many different sources, and A equals B, and you get to that situation. And anyone can test that. The DNA, for example, if there had been DNA there, others could have tested and said, yes, there's DNA present. I think that even if the dog were correct, or the dog's alert were correct, in the sense that there had been a body there at some time, you do have these problems with the interpretation from the handlers, the experts. What did the dog mean? And if the three dogs alerted, it doesn't help matters much when all three dogs are sort of raised by the same person, trained in the same way, maybe trained together. So I think there's still that interpretation problem, I think, is one of the reasons why it's difficult to consider it science in a situation like this particularly. And we believe that because the court erred on admitting the evidence, that this court should reverse this conviction and run for a new trial without the canine evidence. Thank you. Thank you. All right, gentlemen, thank you very much for your argument this morning. We will take the matter under advisement. We will issue a decision shortly, and we will stand in a short recess to prepare for our next case. Thank you.